**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CASSADY MARIE ZIEM,

        Plaintiff,

v.                                                    Case No. 04-CV-73090-DT

MICHAEL ZEHNDER, et al.,

        Defendants.

                                     /

**OPINION AND ORDER GRANTING DEFENDANTS'**
**"MOTION FOR SUMMARY JUDGMENT"**

This employment litigation is before the court on Defendants' May 6, 2005 "Motion for Summary Judgment." Plaintiff filed her written response to Defendants' motion on June 2, 2005 and Defendants filed a reply on June 13, 2005. The court has determined that a motion hearing is not necessary, *see* E.D. Mich. LR 7.1(e)(2), and, for the reasons set forth below, will grant Defendant's motion.

**I. BACKGROUND**

Plaintiff Cassady Ziem filed this employment discrimination case against Michael Zehnder as Director of Public Services for Oakland County (both individually and in his official capacity), Oakland County, and several of her supervisors employed by Oakland County. She complains of adverse employment actions taken by Defendants, with the critical action concerning her transfer or reassignment to a position in the Results Program of the Community Corrections Department where her job duties included drug testing of county inmates.

Her complaint comprises four counts.  In Counts I and II, she claims that Defendants Oakland County and Oakland County Director of Public Services Michael Zehnder, while acting under color of law, violated her constitutional due process rights by taking adverse employment action against her based on her decision to end a personal, romantic relationship with Michael Zehnder's son, Steven Zehnder.  (*See* Pl.'s First Amend. Compl. ¶¶ 16-29.)  In these counts, Plaintiff asserts causes of action under 42 U.S.C. § 1983, alleging violation of both procedural and substantive due process. (*See id.*)

In Count III, Plaintiff claims that Defendant Michael Zehnder tortiously interfered with an advantageous business expectancy of hers with Oakland County in contravention of Michigan law.  (*Id.* at ¶¶ 30-38.)  Finally, in Count IV, Plaintiff claims that, following the initiation of the instant lawsuit in federal court, Defendants Eric Schmidt, Dana O'Neal, and Robert Gatt set out on a course of conduct constituting harassment in retaliation for exercising her First Amendment rights under the Michigan and Federal Constitutions.  (*Id.* at ¶¶ 39-46.)  Defendants' motion seeks summary judgment on all claims.

Plaintiff, who remains an Oakland County employee, began dating Defendant Michael Zehnder's son, Steven Zehner, in June 2000.  (Pl.'s Dep. at 49.)  Plaintiff and Steven Zehnder continued their relationship from 2000 through 2003 and the eventually moved into an apartment together in August 2003.  (Pl.'s Dep. at 49-51.)  According to Plaintiff, Michael Zehnder "used his political influence and arranged" for her employment with the County in October 2003.

2

Plaintiff began her full-time employment in the Community Corrections Division of the Oakland County Public Services Department around October 15, 2003.  (Pl.'s Dep. at 6-8,165.)  She began full-time employment on a probationary basis, was classified as a "Community Corrections Specialist I," and was initially assigned to the "Results" program in the Waterford office, where she worked from October 2003 through December 2003.  (*Id.* at 8.)  Her job duties in the Results program focused on drug testing of parolees, including collecting and testing urine samples and administering breathalyzer tests known as PBTs .  (*Id.* at 48, 165.)

In January 2004, the County transferred Plaintiff from the Results program to Pretrial Services at the Oakland County jail.  Following this transfer, Plaintiff remained classified as a Community Corrections Specialist I, but her job duties and responsibilities were altered.  At the jail, Plaintiff was now responsible for interviewing inmates in order to assist in providing bond recommendation reports.  (*Id.* at 5-6, 166.)  Plaintiff worked midnights for her first four months at the jail, but considered her transfer from the Results program a promotion.  (*Id.* at 167.)

Plaintiff successfully completed her six-month probationary period with the County on April 15, 2004.  She was then granted regular status as a Community Corrections Specialist I.  (Pl.'s Resp. Ex. 5.)  As a result, her classification did not change, but Plaintiff became a Merit Employee with her employment being governed by the Oakland County Merit Rules.  (*Id.* at 39.)

In May 2004, Plaintiff ended (or attempted to end) her romantic relationship with Steven Zehnder, moving out of their shared apartment for approximately three weeks.  (Pl.'s Dep. at 51, 60.)  Plaintiff testified that, sometime within these three weeks in May

2004, she returned to the apartment in an attempt to collect some of her personal belongings. During her visit, she and Steven Zehnder began to argue. She eventually threw Steven Zehnder's car keys at him and left the premises. Plaintiff testified that, during this altercation, Steven phoned his parents and that Ellen Zehnder, Steven's mother, called Plaintiff's cell phone shortly after Plaintiff had left the apartment. (Pl.'s Dep. at 62.) According to Plaintiff, Mrs. Zehnder yelled at Plaintiff, scolding her for her inappropriate treatment of Zehnder's son. Plaintiff states that Mrs. Zehnder demanded that Plaintiff apologize to Steven, and threatened Plaintiff by indicating that if she did not apologize "things were going to get ugly and [Mrs. Zehnder] was going to make sure that everything [she] and her husband ha[d] given [Plaintiff] [would] easily be taken away," including her job. (*Id.* at 62-63.) Mrs. Zehnder testified that she remembered the fight and phone calls in May 2004, recalling that she telephoned Plaintiff telling her, [y]ou need to turn around and go back and sit down, both of you, and apologize to each other and talk calmly to each other." (Ellen Zehnder Dep. at 29-30.)

Plaintiff apologized and eventually moved back into the apartment sometime around Memorial Day in 2004. (*Id.* at 65-66.) Plaintiff continued to live in the apartment with Steven Zehnder until June 23, 2004. On this day, Plaintiff testified that she and Steven had another "huge fight." (*Id.* at 69.) During this June 23 altercation, Plaintiff informed Steven Zehnder that she was again leaving the apartment and began packing her personal property. (*Id.* at 69-70.) According to Plaintiff, Steven called his father during this dispute and, as she was leaving the apartment, told her that "[j]ust because my father can't fire you doesn't mean he can't mess with your job." (*Id.* at 70.)

Plaintiff was transferred from her position at the Oakland County jail to the Results program in the Troy office the following day, June 24, 2004.  Plaintiff began her new work assignment at the Troy office on June 28, 2004.  (*Id.* at 4, 24.)  Plaintiff testified that, on the morning after her fight with Steven Zehnder, Defendant Michael Zehnder called her at work "interrogating [her] about the argument [she] had had with his son the previous night," and that she was reassigned to the Results program four hours later.  (*Id.* at 24.)  Plaintiff claims that her reassignment was a demotion improperly initiated by Michael Zehnder based on her soured relationship with Zehnder's son.  (*Id.* at 45.)

Defendants contend that the timing of Plaintiff's reassignment being announced and her fight with Steven Zehnder were merely coincidence.  Defendants argue that In support, Defendants point to the testimony of the Manager of Community Corrections, Barbara Hankey and the Chief of Field Operations for Community Corrections, Robert Gatt.  Mr. Gatt reports directly to Ms. Hankey.  (Gatt Dep. at 7, Defs.' Mot. Ex. G.)

In her affidavit, Hankey testified that she received a financial status report for the "In Step" program on June 15, 2004, along with a letter indicating that the budget line item for fringe benefits was running low and the budget for the "In Step" program would be exceeded in June.  She determined that it was necessary to bring down expenditures by moving a lower paid staff member into the "In Step" program.  (Defs.' Mot. Ex. C at ¶¶ 3-4)  She determined to move Tom Heger, the highest paid employee in that grant-funded program, and to replace him with another employee who had juvenile experience and a lower rate of pay. (*Id.* at ¶¶ 5-6.)  She then reassigned Cynthia Casagrande to Mr. Heger's position in the "In Step" program.  Casagrande,

however, was reassigned from the Results program.  (*Id.* at ¶ 7.)  Based on other concurrent personnel expansions, Mr. Heger was given the option to be reassigned to a vacancy in the Supervision Unit or the vacancy in the Results program.  (*Id.* at ¶¶ 11-12.)  Heger chose the Supervision Unit.  (*Id.* at ¶ 13.)  According to Hankey, Plaintiff "was reassigned to the Results program based on her low seniority, her pervious work experience in the Results program, and her difficulty completing jail work at acceptable standards." (*Id.* at ¶ 15.)  Hankey also indicated that an employee's opportunities for advancement are not related to or impacted by which program he is assigned to within the Community Corrections Department.  (*Id.* at ¶ 18.)

Mr. Gatt, authored an e-mail dated June 4, 2004 addressing the movement of personnel, indicating that Plaintiff should be moved out of her position at the jail.  (Defs.' Mot. Ex. F.)  Gatt also testified that Plaintiff's reassignment was not a demotion, Hankey was the final decision-maker with regard to the employment action at issue, that he did not receive any directives from Michael Zehnder, and that he did not have any communications with Michael Zehnder regarding the reassignment before it was announced.  (Gatt Dep. at 38-39, 48, 96-97.)

Plaintiff acknowledged that transfers within a classification do happen within her department and division, and that her June 24, 2004 transfer did not result in a re-classification.  (Pl.'s Dep. at 8-12, 45.)  She admits that her classification has never changed during her full time employment with the County, that her transfers or reassignments, including the June 24, 2004 transfer, have all been within the same department and division of Community Corrections, that she has suffered no decrease in her compensation rate, and that she was transferred to the Results program, a job

6

that she had previously performed as a Community Corrections Specialist I. (Pl.'s Dep. at 8-9, 12.) Nevertheless, Plaintiff considers her reassignment and return to the Results program a demotion based on impermissible grounds and initiated this action.

Plaintiff also maintains that Defendants retaliated against her as a result of her having exercised her First Amendment right to file this lawsuit. Specifically, she alleges that she received an unsupported written reprimand for alleged insubordination on October 29, 2004, claiming that her allegedly improper conduct actually conformed with Oakland County policies and procedures. She also argues that Defendants retaliated against her by failing to consider her for jobs that became available during her second tenure in the Results program and by denying her a merit pay increase. (*See* Pl.'s Resp. Exs. 11 & 12.)

Plaintiff maintains that the "most blatant" example of retaliation came on December 30, 2004 when her supervisor, Dana O'Neal, suspended Plaintiff without pay for an alleged violation of policy and procedures in failing to send a specimen to the lab within 24 hours. (Pl.'s Resp. Ex. 14.) Plaintiff appealed and Ms. Hankey ultimately rescinded the one-day suspension. (Pl.'s Resp. Exs. 15-17.)

On April 13, 2005, Plaintiff received her merit increase, and on May 9, 2005, Plaintiff was transferred from the Results program to a position in the Pretrial Services tether unit. (Pl.'s Resp. Ex. 18.) Plaintiff alleges that during her time in the Results program (from approximately June 28, 2004, through April 2005) she was denied promotion opportunities, denied pay raises, was required to drive an additional one-half hour to and from work, and incurred harm to her reputation. (Pl.'s Resp. at 8.)

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.  *See id* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486,492 (6th Cir. 2004) ("we must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") The court does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## III.  DISCUSSION

### A.  Procedural Due Process

The Fourteenth Amendment provides, in part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The Due Process Clause of the Fourteenth Amendment to the United States Constitution 'provides that certain substantive rights--life, liberty, and property--cannot be deprived except pursuant to constitutionally adequate procedures.'" *Mitchell v. Fankhauser*, 375 F.3d 477, 479-80 (6th Cir. 2004) (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541 (1985)). The fundamental elements of procedural due process are notice and an opportunity to be heard. *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

To succeed on a procedural due process claim brought under 42 U.S.C. § 1983, a plaintiff must establish three essential elements: (1) that he has a life, liberty, or property interest protected by the Due Process Clause; (2) that he was deprived of this

9

protected interest; and (3) that the state did not afford him adequate procedural rights prior to the deprivation. *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002). If, however, "satisfactory state procedures are provided in a procedural due process case, then no constitutional deprivation has occurred despite the injury." *Jefferson v. Jefferson County Public Sch. Sys.*, 360 F.3d 583, 587-88 (6th Cir. 2004) Generally, a plaintiff may not seek procedural due process relief under Section 1983 "without first pleading and proving the inadequacy of state or administrative processes and remedies to redress her due process violations." *Id.*

Plaintiff argues that she had a protected property interest in her position with Pretrial Services and that she was entitled to procedural safeguards before she was effectively demoted and reassigned to the Results program.[1] In examining such procedural due process claims, courts engage in a two-step analysis. *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 565 (6th Cir. 2004). First, the court must determine whether the plaintiff had a property interest entitled to due process protection. Second, if such an interest exists, the court must determine what procedures are required to protect that interest (i.e. the court must determine "what process is due.") *Id.*; *Mitchell*, 375 F.3d at 480; *Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002).

Government employees with a protected property interest in their jobs are ordinarily entitled to pre-deprivation notice of the employer's charges and evidence and

---

[1] Unsure as to whether Plaintiff was alleging a deprivation of a liberty interest without adequate procedural due process, Defendants argue that no liberty interest of Plaintiff's is implicated by her reassignment. (Defs.'s Mot. Br. at 13-14.) Plaintiff does not refute this argument in her response, instead relying on her claim that she had a property interest in her position. As such, the court need not address whether Plaintiff's reassignment deprived Plaintiff of a liberty interest without procedural due process.

should be provided an opportunity to respond. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997). Without a property interest, however, a government employee is entitled to no pre-deprivation process whatsoever. *Id.*

Protected property interests do not stem from the Constitution; rather, property interests under the Due Process clause are created by independent sources such as state statutes, regulations, policies, formal contracts, or implied contracts. *Singfield*, 389 F.3d at 565 ("Property interests are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law–rules or understanding that secure certain benefits and that support claims of entitlement to those benefits.'") (quoting *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)); *Woolsey v. Hunt*, 932 F.2d 555, 563 (6th Cir. 1991). A plaintiff must assert "more than abstract desires for or attractions to a benefit," *Hamilton*, 281 F.3d at 529, and must show that he has a "legitimate claim of entitlement" to the benefit. *Roth*, 408 U.S. at 577.

Here, Plaintiff has not identified any state law or regulation creating a property interest in her employment position. Rather, Plaintiff relies on Oakland County Merit Rule 8.3. The parties dispute whether the Oakland County Merit Rules create a protected property interest in Plaintiff's specific assignment to her assignment to her Pretrial Services position within her classification. Defendants maintain that Merit Rule 4.4.2 governs Plaintiff's transfer to the Results program and shows that no property interest exists because such reassignments within an employee's classification are at the discretion of the employer. Merit Rule 4.4 covers "Intra-Departmental Transfer[s] of [ ] Present County Employee[s]." Rule 4.4.2 explains:

11

This section of the Merit System Rules shall not be interpreted as applying to the reassignment of an employee with Merit System status to any similarly classified position covered by the Merit System within that division or department. *The reassignment of an employee is defined as any position change consistent with the employee's current classification, between division within a department, or a change in assigned duties or position within a division consistent with the employee's current classification.* Such reassignments may be made at the discretion of the Department Head.

(Defs.' Mot. Br. Ex. D, Merit Rule 4.4 (emphasis added).)

Conversely, Plaintiff argues that there is at least a triable issue of fact as to whether Plaintiff's transfer constituted a "demotion," requiring just cause under Merit Rule 8.3, thus creating a protected property interest. Merit Rule 8 governs "Disciplinary Actions" and Rule 8.3 Provides that certain disciplinary actions must be "for cause." Rule 8.3 states, in relevant part:

An employee shall receive disciplinary action, whether an oral reprimand, a written reprimand, the withholding of a merit salary increase, a suspension without pay, *a demotion*, or a dismissal, only for a specific clearly described reason or "cause." The department shall clearly specify and identify with particularity the specific reasons or "cause" for the disciplinary action taken.

(Defs.' Mot. Br. Ex. D, Merit Rule 8.3 (emphasis added).)

Merit Rule 8.1.5 defines "Demotion" as "an action taken by a Department Head which reduces an employee's classification to a classification with a lower maximum salary."

Plaintiff's own testimony reveals that she lacks a property interest under the Merit Rules. Plaintiff admits that her transfer was within the same division and department, that her classification did not change, and that her pay rate did not change. (Pl.'s Dep. at 7-10.) At the time of her reassignment, Plaintiff was not terminated, suspended without pay, or reprimanded. (*Id.* at 42.-43.) Her own admissions establish that she

12

was not "demoted" as that term is defined by the very rule she claims creates a protected property interest. There is no claim by Plaintiff that the action taken reduced her classification or lowered her maximum salary. In fact, Plaintiff admitted that the Merit Rules do not create an "entitlement" to "always be in a job that [she] enjoy[s]." (*Id.* at 47.)

To support her claim that a triable issue of fact exists on whether she was demoted, Plaintiff cites Defendant Zehnder's and her own deposition testimony. First, her own subjective belief that the transfer constituted a demotion is of no assistance to her position. (*See* Pl.'s Dep. at 168.) While Plaintiff may "feel" that she was demoted and may very well prefer the job duties of her assignment with Pretrial Services over those with the Results program, her subjective beliefs do not alter the objective definition of "demotion" contained in the source of her alleged property interest. She was not demoted because the undisputed evidence shows that Defendants did not reduce her classification "to a classification with a lower maximum salary." (Defs.' Mot. Br. Ex. D, Merit Rule 8.1.5.)

Second, Plaintiff relies on the following portions of Defendant Zehnder's deposition, where he *may* have indicated his perception that Plaintiff's June 24, 2004 transfer from the Results program to Pretrial Services as a promotion.

> Q: Okay. As the Director of Community Corrections, has it been your experience that the testing job in the Results Program is a job that is usually given to a person with the lowest seniority?
>
> MR. POTTER: Objection to foundation if he would know that. Go ahead if you know.
>
> A: Yeah.
>
> Q: That's been your experience, correct?

A: Yes.  My understanding is they start there.

Q.  Okay.  And the idea is that they'll kind of get to know the system, what happens throughout the Community Corrections Department, and ultimately move on from that position; is that fair?
A.  That's fair.

. . .

Q: We know that ultimately in December 2003 [Plaintiff] had received a position in PreTrial Services at the jail, correct?
A: Correct.

Q: Okay.  But in –
A: Now I'm, I'm saying yeah, correct.  If Barb [Hankey] promoted her to that, you know, then she did or moved her.

Q: Based upon the discussion that we just had about the position in the Results Program being kind of the low-person-on-the-totem-pole position, you would agree with me that the move from the Results Program to the jail would be considered a promotion, correct?

MR. POTTER.  Objection to foundation.  He testified that it was – I don't remember the word he used but use it again.

MR.  EBEL.  I believe he said she was promoted.

MR. POTTER.  And then he corrected himself.

THE WITNESS: I corrected myself.  Moved.

(Michael Zehnder Dep. at 23-25.)

Just as with Plaintiff's subjective beliefs, Defendant Zehnder's ambiguous testimony as to whether Plaintiff was "promoted" or "moved," does not alter the fact that Plaintiff's own admissions show that she was not demoted as defined by Merit Rule 8.1.5.  Even when taking this evidence in a light most favorable to Plaintiff, the undisputed facts show that, no matter what Plaintiff and Zehnder may have believed, Plaintiff's transfer was not a demotion as defined by the Merit Rules.  Plaintiff cannot establish a property interest and her procedural due process claim fails.

14

Case law supports this conclusion.  For example, in *Hughes v. Whitmer*, 714 F.2d 1407 (8th Cir. 1983), the Eighth Circuit considered whether a Missouri state trooper had a property interest in his assignment to a specific geographic location.  The state trooper had been a member of the Missouri Highway Patrol Troop "G" in Willow Springs, Missouri for about ten years, and was informed that he was being transferred to another location, Troop "C", just outside of Saint Louis (about 200 miles from his home in Willow Springs).  *Hughes*, 714 F.2d at 1411.  Two weeks after his transfer, the trooper filed a § 1983 action in federal district court alleging that the transfer violated his due process and equal protection rights.  *Id.* at 1413.  The trooper argued that the state failed to provide him with a name-clearing hearing before his transfer.  *Id.*

The district court found that the trooper's transfer was disciplinary in nature, and that under Missouri law, the trooper was entitled to a due process hearing before the transfer.  *Id.*  The Eighth Circuit, however, reversed, holding that Missouri state law did not create a property interest to remain in a particular Troop within the Highway Patrol.  It examined Missouri state law as the asserted independent source creating the property interest and explained:

> For [the trooper] to have a due process property interest in his assignment to Troop "G," he must identify some rule or mutually explicit understanding that supports his claim of entitlement to a Troop "G" assignment, and that he may invoke at a hearing.  *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).  A clause in a written contract guaranteeing a trooper's preferred assignment would be the classical way of showing a mutually explicit understanding.  *Id.*  But [the trooper] offered no evidence that he has a contract with the Patrol.  A statute or agency regulation may also provide the basis of a mutually explicit understanding.  *Bishop v. Wood,* 426 U.S. 341, 344-45, 96 S.Ct. 2074, 2077-2078, 48 L.Ed.2d 684 (1976).  The pertinent Missouri statutes, however, only guarantee that a trooper will not be dismissed from the Patrol absent "cause."  While this language may support Hughes' claim of entitlement to continued employment with the Patrol, *see Bishop v. Wood,* 426 U.S. at

15

345 & n. 8, 96 S.Ct. at 2078 & n. 8, it does not guarantee Hughes the indefeasible right to remain in a particular troop within the Patrol. *Arnett v. Kennedy,* 416 U.S. 134, 151-52, 94 S.Ct. 1633, 1642-1643, 40 L.Ed.2d 15 (1974). To the contrary, Mo. Rev. Stat. § 43.120(1) (1978) empowers the Superintendent of the Patrol to "assign members of the patrol to such districts in the manner he deems proper .... He shall have authority in his discretion to call members of the patrol from one district to another." In reviewing a similar statutory scheme, the Seventh Circuit concluded that a Chicago police officer had no property interest in a particular geographic assignment because the applicable Illinois statute protecting police officers from adverse action without cause was limited by its own terms to discharges and suspensions. *Confederation of Police v. Chicago,* 547 F.2d 375, 376 (7th Cir. 1977). Similarly, Mo. Rev. Stat. § 43.150 is limited by its own terms to dismissals. Therefore, we hold that applicable Missouri statutes and Patrol general orders do not support Hughes' claim that he has a property interest in his assignment to Troop "G."

*Id.* at 1414.

Similar to the Missouri law examined in *Hughes,* the Merit Rules provide Oakland County management officials with discretion to transfer employees within their classifications. (Defs.' Mot. Br. Ex. D, Merit Rule 4.4.2.) While the language in Merit Rule 8.3, also similar the Missouri law examined in *Hughes*, covers demotions and other punitive acts, it does not create a property interest in Plaintiff's position with Pretrial services or a right not to be transferred from this position to another in her classification.

This court also finds the facts and reasoning of an unpublished decision by the Sixth Circuit relevant and instructive.[2] In *Lisle v. Metropolitan Government of Nashville*

---

[2] Although unpublished decisions in the Sixth Circuit are not binding precedent, s*ee Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir 1996) (unpublished opinions "carry no precedential weight [and] have no binding effect on anyone other than the parties to the action."); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 833 (6th Cir 2000) (unpublished decisions are not binding precedent), their reasoning may be "instructive" or helpful. *See Boyd v. Yukins* 99 Fed.Appx. 699, 703, 2004 WL 1193952, *4 (6th Cir. May 27, 2004) ("Our unpublished case of *Mix v. Robinson*, 64 Fed.Appx. 952, 957-58 (6th Cir. 2003), is instructive."); *Combs v. Int'l Ins. Co.* 354 F.3d 568, 593 (6th Cir ,2004)

*and Davidson County*, 73 Fed.Appx 782, 2003 WL 21580642 (July 9, 2003), police officers, who had been transferred from patrol positions to clerical positions in the police communication department after newspaper reports of their alleged misconduct were released, sued their public employer under § 1983 for deprivation of their due process rights.  The officers claimed, *inter alia*, that their transfers deprived them of their property interests in their positions as patrol officers without procedural due process.  *Id.* at *1.

The district court ruled that the officers had failed to state a claim and the Sixth Circuit affirmed the ruling on the merits, remanding on an attorney's fees ruling.  *Id.*  In doing so, the court examined several potential sources of the officers' alleged protected property interest, including the Tennessee civil service statutes and Tennessee common law.  The court determined that the state statutes created a property interest in civil service employees such as the officers, but that the property interested related to suspensions, demotions, and dismissals, but not transfers.  *See id.* at *2-3.

Likewise, examining the Oakland County Merit Rules in this action, reveals that Merit Rule 8.3 does not create a protected property interest in a particular position within the job classification of Community Corrections Specialist I.  No pre-deprivation process was required.  This conclusion is strengthened by the plain language in Merit Rule 4.4.2 giving the employer discretion to make intra-departmental reassignments within the same classification.  *See also Sullivan v. Brown*, 544 F.2d 279, 282-83 (6th Cir. 1976) (transfer of public school teacher to another high school under Tennessee

---

(although *Willits* [*v. Peabody Coal Co.*, 188 F.3d 510, 1999 WL 701916 (6th Cir. Sept. 1, 1999)] is an unpublished opinion, its reasoning is instructive.").

17

law did not deprive teacher of property interest triggering procedural due process protections); *Gamper v. Ala. Dep't of Corrs.*, 968 F. Supp. 1483, 1485-86 (M.D. Ala. 1997) (no property interest in position as drill instructor under Alabama law where employer had discretionary authority to transfer employee from one position to another "in the same class"); *Grasso v. United States*, 535 F. Supp. 309, 312-13 (E.D. Mo. 1982) (no property interest implicated when IRS had unfettered discretion to transfer employee under relevant federal statute).

### B. Substantive Due Process

The substantive component of the Due Process Clause imposes certain limitations on government deprivations of life, liberty, and property, independent of the procedural limitations imposed by procedural due process concerns.  *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992).  Substantive due process claims involve allegations of (1) deprivations of a particular constitutional right and (2) actions that "shock the conscience."  *Midkiff v. Adams County Regional Water Dist.*, -- F.3d –, 2005 WL 1279538, at *10 (6th Cir. May 24, 2005); *Braley v. City of Pontiac,* 906 F.2d 220, 224-25 (6th Cir. 1990).  "One aspect of substantive due process is the right to be free from 'arbitrary and capricious' action by government actors."  *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003).

The limitations of substantive due process apply to both legislative actions and executive actions taken by the government.  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  "However, the criteria for determining whether a government action is arbitrary in violation of substantive due process 'differ depending on whether it is legislation or a specific act of a governmental officer that is at issue.'"  *Klimik v. Kent*

18

*County Sheriff's Dep't*, 91 Fed.Appx. 396, 404, 2004 WL 193168, at *7 (6th Cir. Jan. 30, 2004) (quoting *Lewis*, 523 U.S. at 846).

When an executive officer's action is at issue, as is the case with Plaintiff's allegations, the action violates substantive due process "only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Lewis*, 523 U.S. at 847 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)). "[T]he 'arbitrary and capricious' standard . . . is simply another formulation of, but is no less stringent than, the more traditional 'shocks the conscience' standard," *Bowers*, 325 F.3d at 763, and "only the most egregious official conduct" violates substantive due process under this standard. *Lewis*, 523 U.S. at 846.

It cannot be disputed that Plaintiff's asserted right not to be reassigned from her Pretrial Services position at the Oakland County jail does not rise to the level of a fundamental right, triggering substantive due process protections.

> Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process. The substantive Due Process Clause is not concerned with the garden variety issues of common law contract. Its concerns are far narrower, but at the same time, far more important. Substantive due process "affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental....'" It protects those interests, some yet to be enumerated, "implicit in the concept of ordered liberty ..." like personal choice in matters of marriage and family.
>
> State-created rights such as [the appellant's] contractual right to promotion do not rise to the level of "fundamental" interests protected by substantive due process. Routine state-created contractual rights are not "deeply rooted in this Nation's history and tradition," and, although important, are not so vital that "neither liberty nor justice would exist if [they] were sacrificed."

*Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990) (citations omitted)

The Sixth Circuit has previously ruled that a public employee's *right to be discharged* only for cause does not enjoy substantive due process protections.  *Sutton v. Cleveland Board of Education*, 958 F.2d 1339 (6th Cir. 1992).  *A fortiori*, Plaintiff's alleged right not to be *reassigned* in the employment context triggers even fewer concerns than a discharge and does not enjoy protection under substantive due process.

On the other hand, substantive due process concerns "may be implicated when a public employee is discharged for reasons that shock the conscience."  *Perry v. McGinnis*, 209 F.3d 597, 609 (6th Cir. 2000).  Here, Plaintiff alleges that Defendant Zehnder used his executive authority to single out Plaintiff and to have her reassigned for punitive reasons (i.e. the improper motive of retribution for the falling out between Zehnder's son and Plaintiff), constituting conscience-shocking action.

This argument, however, fails for two reasons.  First, although some adverse employment actions that "shock the conscience" may implicate substantive due process rights, "[t]he violation of a fundamental right, however, is still necessary for a successful due process claim."  *Perry*, 209 F.3d at 609.  The court again finds a recent unpublished decision from the Sixth Circuit instructive.  In *Bracken v. Collica*, 94 Fed.Appx. 265, 2004 WL 619203 (6th Cir. Mar. 24, 2004), the court considered several claims by a former city law department employee, including  whether the mayor's decision to discharge that employee without city council approval "shocked the conscience" in violation of substantive due process.

In *Bracken*, the city's mayor was required, under the city's charter, to obtain approval from city council before removing the law department employee.  *Id.* at *1.

20

After initially approving the plaintiff's dismissal, the city council reconsidered and repealed its legislative act approving of the mayor's decision to terminate the employee. *Id.* The employee returned to work. But the mayor subsequently ordered the police to remove him from the building where his office was located and, notwithstanding the city council's refusal to approve the termination, continually refused to permit the employee to return to work. *Id.*

After rejecting the employee's procedural due process claim, the court considered his substantive due process claim. The panel, relying on *Charles* and *Sutton supra,* ruled that the employee did not have a right to his position protected by substantive due process. *Id.* at *3-4. The employee, however, also argued that her discharge by the mayor in violation of the city ordinance requiring city council's approval of the adverse action "shocked the conscience." *Id.* at *4. The court, relied on *Perry v. McGinnis,* and reject this argument. It stated:

> Bracken contends that her discharge in violation of the ordinance's requirement of council approval should shock the conscience. However, the violation of a fundamental right is still necessary for a successful substantive due process claim. Because Bracken has failed to allege a violation of a fundamental right, we need not consider whether her discharge shocks the conscience.

*Id.* at 4 (citation omitted).

Second, even if Plaintiff's substantive due process claim did not require a violation of a fundamental right, her claim would fail because no reasonable jury could conclude that her reassignment to the Results program without a change in her classification or pay rate was "most egregious" conduct that shocks the conscience. *See Lewis*, 523 U.S. at 846. Reassignment to the position that she previously willingly agreed to perform only a few months before is not the type of oppressive government

21

action that is limited by the substantive component of the due process clause.  *See Daniels v. Williams,* 474 U.S. 327, 332 (1986) (courts should "bear in mind Chief Justice Marshall's admonition that 'we must never forget, that it is *a constitution* we are expounding,' *McCulloch v. Maryland,* 4 Wheat. (17 U.S.) 316, 407, 4 L.Ed. 579 (1819) (emphasis in original).").  The court will grant Defendants' motion for summary judgment on Plaintiff's substantive due process claim.

### C.  Municipal Liabilty

Defendants also seek summary judgment on Plaintiff's claims for municipal liability against the County itself.  Because Plaintiff cannot rely on *respondeat superior* to hold Oakland County liable for constitutional violations under § 1983, *see Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), she must establish that the county's official policies or customs (or lack thereof) were a "moving force" behind the deprivation of Plaintiff's rights and arose as a result of "deliberate indifference" to her rights.  *See Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996).

Although municipalities are considered "persons" for the purposes of § 1983, they are not "liable for every misdeed of their employees and agents."  *Garner v. Memphis Police Dep't,* 8 F.3d 358, 363 (6th Cir.1993).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell,* 436 U.S. at 694.

To demonstrate municipal liability, a plaintiff must: (1) identify the municipal policy or custom; (2) connect the policy to the municipality; and (3) show that his

particular injury was incurred due to execution of that policy. *Alkire v. Irving*, 330 F.3d 802, 814-15 (6th Cir. 2003).

Plaintiff has failed to present admissible evidence, from which a reasonable jury could conclude that all three elements are satisfied in this case. The only *evidence* Plaintiff identifies in response to Defendants' motion is Steven Zehnder's testimony that his father helped Plaintiff obtain her employment with Oakland County, (Steven Zehnder Dep. at 17), Michael Zehnder's testimony that he spoke with Barb Hankey when Plaintiff was interviewing and told Hankey that Plaintiff was "a good young lady," (Michael Zehnder Dep. at 14), and Plaintiff's testimony that Ellen Zehnder threatened to have her fired. (Pl.'s Dep. at 62-63.)

This evidence is not sufficient to establish that the County adopted or acted pursuant to an official policy or custom, nor does it permit a reasonable jury to conclude that a constitutional injury was caused by the execution of a County policy or custom. Simply put, there is no evidence connecting a County policy or custom to the alleged deprivation of constitutional rights.

Plaintiff's responds by identifying the elements to "successfully plead an official capacity claim against a municipal employee or entity," and argues that Plaintiff's "allegations" satisfy the requirements to maintain a claim for municipal liability. (Pl.'s Resp. at 15.) Plaintiff also asks for leave to amend her complaint in the event the court determines that more specific allegations are required. Her argument on this issue is simply non-responsive. Defendants have moved for *summary judgment* and have identified an absence of *evidence* to support a municipal liability claim. Plaintiff's *allegations* are not challenged as being insufficient and amendment of the complaint's

allegations under Federal Rule of Civil Procedure 15 would be untimely and futile.
Under Rule 56, Plaintiff has an obligation to identify admissible evidence once
Defendants carry their initial burden as the moving party.  She has failed to do so with
regard to her § 1983 claims against Oakland County.

### D.  First Amendment Retaliation

To establish a prima facie case of First Amendment retaliation under 42 U.S.C. §
1983, a plaintiff must demonstrate that: (1) he was engaged in constitutionally protected
activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the
protected speech or conduct was a "substantial" or "motivating factor" in the adverse
action.  *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004); *Leary v. Daeschner*, 349
F.3d 888, 897 (6th Cir. 2003).  If a plaintiff meets his burden to show that the protected
conduct was a substantial or motivating factor in an employer's decision to take adverse
employment action against him, the burden shifts to the defendant to show by a
preponderance that it would have taken the same action notwithstanding the protected
activity.  *Leary*, 349 F.3d at 898.[3]

_____

[3] The court will apply the same analysis to Plaintiff's retaliation claims under the
Michigan and the United States Constitutions.  *See Smith v. City of Holland Bd. of
Public Works*, 102 F. Supp. 2d 422, 430 (W.D. Mich. 2000) ("[T]he elements of a
retaliation claim pursuant to the Michigan Constitution are the same as those necessary
to establish a claim under the First Amendment to the United States Constitution.").
The rights protected under Article I Sections 3 and 5 of the Michigan Constitution are
coterminous with the rights afforded by the First Amendment to the United States
Constitution, *Michigan State AFL-CIO v. Civil Serv. Comm'n*, 528 N.W.2d 811, 817, n.17
(Mich. Ct. App. 1995), and other courts have determined that the same elements
required for a First Amendment retaliation claim under federal law are necessary to
establish a claim under Article I Sections 3 and 5 of the Michigan Constitution.  *See
Melchi v. Burns Int'l Sec. Servs.*, 597 F. Supp. 575, 581-83 (E.D. Mich. 1984) (applying
elements of First Amendment retaliation claim to a claim brougth under Michigan state
law); *Hopkins v. Midland*, 404 N.W.2d 744, 751 (Mich. Ct. App. 1987) (same).

Defendants seeks summary judgment on Plaintiff's retaliation claims, arguing that the filing of her lawsuit is not protected activity because it does not touch on a matter of public concern and that she cannot establish a causal connection between the filing of the lawsuit and the adverse employment actions.  Plaintiff argues that the basis of her lawsuit was not purely personal and that because it was filed to address her "unlawful termination"[4] it touches on a matter of public concern.  (Pl.'s Resp. at 20.) Because the court finds that the filing of Plaintiff's lawsuit does not involve a matter of public concern, it will grant Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claims.

The Sixth Circuit summarized the well-established framework for analyzing whether a public employee's speech or conduct is protected by the First Amendment in *Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003).

> A public employee has a constitutional right to comment on matters of public concern without fear of reprisal from the government as employer. *Connick v. Myers,* 461 U.S. 138, 140, 145-46, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Bd. of Educ.,* 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).  Thus, even though the government has greater authority to regulate the speech of its employees than it has in regulating the speech of the public at large, public employers cannot silence their employees simply because they disapprove of their speech.   *See Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). "[R]etaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation."  *Perry v. McGinnis,* 209 F.3d 597, 604 (6th Cir. 2000).
>
> This circuit has a established a three-step process for evaluating a public employee's claim of unlawful retaliation.  First, the employee must establish that his speech is protected.  To accomplish this, the employee must show that his speech touches on a matter of public concern, *Connick,* 461 U.S. at 147, 103 S.Ct. 1684, and demonstrate that his

_____

[4] Plaintiff was never terminated, but merely reassigned.  The statement is apparently a scrivener's error.

> interest in the speech outweighs the government's countervailing interest
> in promoting the efficiency of the public service it provides as an employer.
> *Pickering*, 391 U.S. at 574, 88 S.Ct. 1731.

*Id.* at 643.

Whether the employee's speech involves a matter of public concern must be determined by the content, form, and context of a given statement and is a question of law for the court, *Leary*, 349 F.3d at 899; *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001), and "is a question of law for the court." *Farhat*, 370 F.3d at 589.

Speech involves a matter of public concern when it involves "any matter of political, social, or other concern to the community." *Leary*, 349 F.3d at 899 (quoting *Connick v. Meyers*, 461 U.S. 138, 146 (1983)); *Farmer v. Cleveland Public Power*, 295 F.3d 593, 600 (6th Cir. 2002). This type of speech must be differentiated from a public employee's speech that involves matters of personal interest which are not protected. *Id.* When a public employee speaks "as an employee upon matters only of personal interest . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employer's behavior." *Connick*, 461 U.S. at 147. On the other hand, speech involves matters of public concern "when it involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 893 (6th Cir. 2003) (quoting *Brandenburg v. Hous. Authority of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)).

Further, "[w]hen examining the content of speech, 'the proper inquiry [is] not what might incidentally be conveyed by the fact that the employee spoke in a certain way,

26

[but] the *point* of the speech in question.' The point of the speech, however, is not to be confused with the speaker's motivation for speaking. The inquiry is primarily concerned with what the speaker intended to communicate through his statement, and not his reasons for speaking." *Taylor*, 338 F.3d. at 645 (citations omitted); *see also Farhat*, 370 F.3d at 591; *Dambrot v. Central Mich. Univ.,* 55 F.3d 1177, 1187-88 (6th Cir. 1995) (courts must look to the "point" of the speech and the "communicative purpose" of the speaker); *Rahn v. Drake Ctr., Inc.,* 31 F.3d 407, 412-13 (6th Cir. 1994) (courts must examine the "complete record" and determine the "focus" of a statement for which employee claims protection). Under the "content test" of *Connick*, "the pertinent question is not *why* the employee spoke, but *what* he said." *Farhat*, 370 F.3d at 591.

The content, form, and context of Plaintiff's lawsuit do not support a finding that the speech at issue touched on a matter of public concern. The allegations in Plaintiff's lawsuit focus on obtaining remedies for her personal employment grievances based on what she believes to be an unlawful reassignment in violation of her constitutional rights. Her allegations are specific to her employment position and job duties with the Oakland County Community Corrections Department. Further, her allegations of improper motive and conduct by Defendant Zehnder do not relate to matters of public concern. Plaintiff alleges that Michael Zehnder's actions were based on Plaintiff's soured, romantic relationship with his son, a highly personal issue and of little public concern. The overall context of the lawsuit, shows that the primary focus or communicative purpose of Plaintiff's speech is related to Plaintiff's "own personal 'beef'" with Michael Zehnder and the County. *See Farhat*, 370 F.3d at 593.

The court is not persuaded by Plaintiff's argument that her speech was on a

matter of public concern because "the basis of the lawsuit was to address Plaintiff's unlawful termination."  (Pl.'s Resp. at 20.)  Plaintiff's claim that she was addressing "unlawful" actions is insufficient.  At best, it constitutes a fleeting reference to matters of concern to the public.  *Id.* at 592-93.  Moreover, the Sixth Circuit has determined that "[t]he fact that an employee alleges discrimination on the part of a public employer is not itself sufficient to transform the dispute into a matter of public concern."  *Jackson v. City of Columbus*, 194 F.3d 737, 746 (6th Cir. 1999) *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).  As such, Plaintiff's allegation of unlawful discrimination in her own individual employment dispute over job duties and assignments does not touch on a matter of public concern.

In *Jackson* a public employee argued that his right to free speech was violated when the city imposed a gag order on him, forbidding him from speaking to news reporters about an ongoing investigation into his alleged misconduct.  *Id.*  The *Jackson* court found that Jackson had sufficiently alleged that his speech involved a matter of public concern.  In doing so the court highlighted that Jackson was a high-profile member of the community and indicated that "[b]ecause the investigation involved allegations of corruption and abuse of power within the Division of Police, as well as the City's allegedly racial motivations, the gag order could be construed as *covering more than a private employment dispute*."  *Id.* at 747 (emphasis added).  Here, unlike the plaintiff in *Jackson*, there is no basis to find that Plaintiff's lawsuit relates to anything other than her personal employment dispute.

Similarly in *Gragg v. Somerset Technical College*, 373 F.3d 763 (6th Cir. 2004), the court held that a retaliation claim by a state employee based on her request for

28

overtime pay could not survive because the overtime request was not protected speech
as it did not touch upon a matter of public concern.  The state employee in *Gragg*
alleged retaliation for four types of speech, including her complaint that she and other
employees should receive overtime for work on a particular project.  *Id.* at 766.  The
court found this speech not protected, explaining:

> We must address, however, the one speech retaliation claim that was not
> at issue in the interlocutory appeal--i.e., the claim based upon Gragg's
> alleged request for overtime pay.  We hold that this request does not
> constitute protected speech because it is not a matter of public concern.
>
>> [A] particular expression addresses a matter of public concern
>> where it can 'be fairly considered as relating to any matter of
>> political, social, or other concern to the community....' The inquiry is
>> made based on by 'the content, form, and context of a given
>> statement, as revealed by the whole record.'  Speech does not
>> generally touch on a matter of public concern, as that requirement
>> has been interpreted, where its aim is to air or remedy grievances
>> of a purely personal nature.
>
> *Valot v. Southeast Local Sch. Dist. Bd. of Educ.,* 107 F.3d 1220, 1226 (6th
> Cir.1997) (citations omitted).  As the district court recognized, Gragg's
> motivation in requesting overtime pay was to ensure that she received
> compensation for additional work; thus, her aim was "to air or remedy
> grievances of a purely personal nature."  *Id.*  In our view, the "content,
> form, and context" of Gragg's statement compel the conclusion that it was
> not a matter of public concern and, thus, was not constitutionally
> protected.

*Id.*; *see also Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994) (holding that
retaliation for filing a lawsuit is prohibited by First Amendment's free speech protection
and that "[i]f a public employee is retaliated against for filing a lawsuit, the public
employee has no First Amendment claim unless the lawsuit involves a matter of public
concern").

Although it may have been "unlawful" to deny the employees in *Gragg* overtime
pay, the unlawful nature of this personal grievance did not transform the complaint into

speech touching on a matter of public concern.  *See Gragg*, 373 F.3d at 766.  Similarly, the content, form, and context of Plaintiff's lawsuit (the asserted protected speech) does not involve a matter of public concern.

### E.  Tortious Interference

In Count III of her first amended complaint, Plaintiff alleges that Defendant Zehnder tortiously interfered with her valid business relationship or expectancy in her position as a merit employee with Oakland County by directing her reassignment to the Results program, which included less desirable job duties including the taking of urine samples for drug testing.

Under Michigan law, there are four elements of a claim for tortious interference with a business relationship: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the defendant of the relationship or expectancy; (3) intentional interference by improperly inducing or causing a breach or termination of the relationship or expectancy, and (4) damages.  *Am Council of Cert. Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery*, 185 F.3d 606, 624 (6th Cir. 1999); *Mino v. Clio School Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003).

A valid business expectancy is one that is reasonably likely or probable, not merely hoped for, and cannot be based on wishful thinking.  *First Public Corp. v. Parfet*, 631 N.W.2d 785 (Mich. Ct. App. 2001); *Lucas v. Monroe County*, 203 F.3d 964, 979 (6th Cir. 2000).

Plaintiff's tortious interference claim fails because no reasonable jury could conclude that she had a reasonable expectation in preserving her job duties at her Oakland County jail assignment within her classification of Corrections Specialist I.  Nor

30

could a reasonable jury find that Defendants' reassignment, within the County's

discretion and permitted under the Merit Rules, constituted a breach or termination of

that expectancy.  As discussed above, Plaintiff testified that she was never reclassified

or subjected to a lower pay rate.  While she might have a reasonable expectation not to

be demoted under Oakland County Merit Rule 8.3 without cause, Merit Rule 4.4

unambiguously provides her employer with discretion to make the type of reassignment

made in this case.  Her subjective preferences to remain in Pretrial Services and to

keep her prior job responsibilities are not sufficient to constitute a valid business

expectancy.

## IV.  CONCLUSION

IT IS ORDERED that Defendants' May 6, 2005 "Motion for Summary Judgment"

[Dkt. # 37] is GRANTED.

 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  June 30, 2005


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, June 30, 2005, by electronic and/or ordinary mail.

 S/Lisa G. Teets
Case Manager and Deputy Clerk
(313) 234-5522